E-FILED
Thursday, 31 July, 2014  04:13:19 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

JERMAINE JACKSON,

        Plaintiff,

vs.

TIMOTHY B. MOORE, DETECTIVE
GARNER, UNKNOWN OFFICERS,
and the CITY OF PEORIA,

        Defendants.

Case No. 13-cv-1130

## MOTION FOR SUMMARY JUDGMENT

NOW COME the Defendants, TIMOTHY B. MOORE, STEVEN W. GARNER, and

CITY OF PEORIA, by their attorneys, QUINN, JOHNSTON, HENDERSON,

PRETORIUS & CERULO, and for their Motion for Summary Judgment, state:

## I. INTRODUCTION

On October 19, 2011, Clarence Heinz ("Heinz") was the victim of a home invasion

and burglary. Heinz and another witness, Ronald Bullock ("Bullock"), were presented

with a photo line-up which contained Plaintiff Jermaine Jackson's ("Jackson")

photograph. Both Heinz and Bullock identified Jackson as the person who broke into

Heinz' house on October 19, 2011. Based on this probable cause, Jackson was arrested,

indicted, and ultimately tried from September 10, 2012 – September 12, 2012. After his

arrest, detectives also obtained a search warrant and searched his home. After his three-

day trial, Jackson was acquitted.

On March 11, 2013, Jackson filed a seven-count Complaint against the Defendants, Timothy B. Moore ("Moore"), Steven W. Garner ("Garner"), and the City of Peoria ("the City"), collectively "Defendants," alleging false arrest, intentional infliction of emotional distress, violation of his due process right to a fair trial, malicious prosecution, and unreasonable search and search and seizure. The City, as the employer of the individual Defendants, is named for indemnification purposes only under 745 ILCS 10/9-102.

Jackson's false arrest claim in Count I fails because there was sufficient probable cause for his arrest. Jackson's intentional inflection of emotional distress claim in Count III fails because there is no evidence that any of the individual Defendants' behavior was "extreme and outrageous" or that Jackson actually suffered any severe emotional distress. Count IV of Jackson's Complaint fails because there is no evidence that Jackson was deprived of his right to a fair trial, as he was acquitted of all charges. Jackson's claim of malicious prosecution in Count V fails because there was probable cause for his arrest and there is no evidence of any malice by Defendants. Lastly, Jackson's unreasonable search and seizure claim in Count VII also fails because the detectives had a valid warrant for which there was probable cause and there is no evidence that Jackson's home was searched without a warrant. For these reasons, Defendants' Motion for Summary Judgment must be granted.

## II. STATEMENT OF UNDISPUTED MATERIAL FACTS

1.   On October 19, 2011, Clarence Heinz ("Heinz")  was the victim of a home invasion and residential burglary. Heinz dep. (Exhibit 1) at 10.

2.   Heinz was home during the crime. Heinz was battered and put in a closet by the first offender, but he observed the first offender both at the time of the initial attack and from the closet. Heinz dep. at 30-31.

3.   The first offender called a second person to come in after Heinz was subdued. Heinz dep. at 18.

4.   One of the items that was stolen from Heinz was his car. Heinz dep. at 21.

5.   Defendant Peoria Police Detective Steven W. Garner ("Garner") was assigned to the Heinz case on October 19, 2011. Garner dep. (Exhibit 2) at 17.

6.   As part of his initial investigation, Garner interviewed persons at the scene, including the first responding officer and the victim, Heinz. Garner dep. at 18.

7.   Garner then canvassed the area to find witnesses or leads. Garner dep. 18-19.

8.   The general description given of the man who broke into Heinz's home was a black male, 5'8" tall, and 190 pounds. Garner dep. at 22.

9.   Heinz also said that that the man who broke into house was wearing a shirt with an emblem on it. Heinz dep. at 27.

10.     Defendant Peoria Police Detective Timothy Moore ("Moore") also testified that the description Heinz gave was two black males, one bigger than the other. Moore dep. (Exhibit 3) at 19.

11.     Ronald Bullock ("Bullock") was a witness to the events that went on around Heinz's house. Bullock dep. (Exhibit 4) at 9.

12.     Bullock saw one of the assailants loitering near Heinz' house while Bullock was walking his dog. Bullock dep. at 9

13.     Bullock is a neighbor of Heinz. Bullock at 9.

14.     Following one lead, Garner put Michael Ralph in a photo lineup. Garner dep. at 27.

15.     On October 21, 2011, Bullock was presented with the first photo line-up, which included Michael Ralph but not Plaintiff Jermaine Jackson ("Jackson"). Bullock dep. at 17.

16.     Garner explained to Bullock that the suspect may or may not be in the line up. Bullock dep. at 18.

17.     Bullock was shown six photos and picked one of them. Bullock dep. at 18-19.

18.     Bullock was not overwhelmingly confident when he made the pick out of the first photo line-up. Bullock dep. at 19.

19.     Michael Ralph's photo was in the first phone line-up and it was his photo that Bullock had picked. Garner dep. at 29-30.

4

20.     On October 21, 2011, the same first photo line-up that was shown to Bullock was shown to Heinz. Garner dep. at 32.

21.     Unlike Bullock, Heinz did not select any of the pictures from the first photo line-up. Heinz dep. at 13.

22.     Heinz told Garner on October 21, 2011 that he got a very good look at the suspect. Garner dep. at 31.

23.     Moore stated that Michael Ralph was not interviewed because he was not identified by Heinz in the first photo line-up. Moore dep. at 31.

24.     On October 27, 2011, Garner created a second photo line-up including Plaintiff Jermaine Jackson ("Jackson"). Garner dep. at 38.

25.     Jackson's photo was in the second photo line-up because Peoria Police Detective Jason Leigh ("Leigh") informed Garner and Moore that he was investigating cases involving burglaries committed by Jackson's son. During an interview, Jackson's son told Leigh that Jackson was telling his son which places "to hit." Moore dep. at 59-60.

26.     On October 27, 2011, Garner presented Bullock with a second photo line-up. Bullock dep. at 20.

27.     Bullock picked Jackson's photo from the second photo line-up. Garner dep. at 49-50. See also Exhibit 5 attached hereto indicating Bullock's pick in the second photo line-up.

28.     Bullock felt a lot more comfortable with his pick of Jackson's photo in the second photo line-up than he did with his pick of Michael Ralph's photo in the first photo line-up. Bullock dep. at 21-22.

29.     On October 27, 2011, Garner also presented Heinz with the second photo line-up. Heinz dep. at 14.

30.     Heinz also picked Jackson's photo from the second photo line-up. Garner dep. at 49-50. See also Exhibit 6 attached hereto indicating Heinz's pick in the second photo line-up.

31.     When Heinz was asked by Garner if he was sure of his pick of Jackson in the second photo line-up, he said he was pretty sure with his pick. Heinz dep. at 33.

32.     When Heinz was asked at his deposition regarding his pick of Jackson in the second photo line-up, he said he was pretty confident with his pick. Heinz dep. at 33.

33.     Jackson became a suspect of the Heinz home invasion and residential burglary after he was positively identified by Bullock and Heinz. Garner dep. at 76.

34.     Jackson was not arrested right after Heinz and Bullock identified him in the second line-up because Garner wanted to interview Jackson first. Garner dep. at 58.

35.     Garner found Jackson at the police station on October 27, 2011 because he was there to talk to Detective Leigh about his son. Garner dep. at 60-61.

6

36.     Leigh informed Jackson on October 27, 2011 that Plaintiff's son, Jermaine Jackson Jr., had implicated Jackson in some burglaries that had occurred. Jackson dep. (Exhibit 7) at 39.

37.     Jackson was read his rights, understood why he was there, and participated in an interview conducted by Garner. Garner dep. at 83.

38.     Garner asked Jackson about his whereabouts on October 19, 2011. Garner dep. at 65.

39.     Following the interview, Jackson was arrested for the Heinz home invasion and residential burglary. Jackson dep. at 8.

40.     On October 29, 2011 at 12:37 p.m., Garner and Moore obtained a search warrant to search Jackson's house and the warrant was executed on the same day at 1:20 p.m. Garner dep. at 102-103. See also Complaint for Search Warrant, Search Warrant, and Search Warrant Inventory (Exhibit 8).

41.     The purpose of the search warrant was to see if Heinz' property or any other evidence Garner could obtain from Plaintiff's home might still be there. Exhibit 8.

42.     Among the items found at Plaintiff's home pursuant to the search warrant were two shirts with emblems on them. Garner dep. at 106-107. See also Exhibit 8.

43.     Holly Adornato ("Adornato") is an individual who was Jackson's neighbor to the immediate left at the time the search warrant was obtained. Adornato dep. (Exhibit 9) at 5, 11.

7

44.     Adornato's address is 1010 East Virginia Ave, Peoria, Illinois. Adornato dep. at 13.

45.     Jackson's address at the time of the incident was 1012 East Virginia Ave, Peoria, Illinois. Jackson dep. at 5.

46.     Adornato saw three police officers outside Jackson's home to execute the search warrant on October 29, 2011, but Adornato did not see any officers go into Jackson's home any time prior to the execution of the search warrant. Adornato dep. at 18.

47.     On November 15, 2011, Jackson was indicted for the Heinz home invasion and burglary. See Bill of Indictment (Exhibit 10).

48.     From September 10, 2012 – September 12, 2012, Jackson's trial was held and a verdict of not guilty was entered in favor of Jackson. See Trial Order Verdict (Exhibit 11).

49.     Before Plaintiff's trial and after he identified Jackson in the second photo line up, Heinz did not see any other photographs of Jackson nor did he see him in person. Heinz dep. at 34-35

50.     At Jackson's trial, Heinz positively identified Jackson as the person who broke into his house. Heinz dep. at 16.

51.     Heinz was confident in his identification of Jackson at the trial. Heinz dep. at 35.

8

52. Similarly, Bullock did not see any other photographs of Jackson nor did he see him in person before Jackson's trial. Bullock dep. at 24-25.

53. Bullock also positively identified Jackson at his trial as the individual he saw around Heinz's house on October 19, 2011. Bullock dep. at 25.

54. Bullock was confident in his identification of Jackson at the trial. Bullock dep. at 25.

55. At Heinz's deposition on May 28, 2014, almost three years after the October 19, 2011 incident, Heinz identified Jackson, who was present at the deposition, as the person who broke into his house. Heinz dep. at 19.

56. Jackson has not undergone any mental health treatment as a result of the incident, other than one mental health counseling visit while he was in custody at the Peoria County Jail. Jackson dep. at 59.

57. Jackson has not been prescribed any medication to treat any mental health issues as a result of the underlying facts. Jackson dep. at 59.

### III. ARGUMENT

In deciding a motion for summary judgment the court does not evaluate the weight of the evidence, judge the credibility of witnesses, or determine the ultimate truth of the matter; instead the court must ascertain whether there exists a genuine issue of triable fact. *Anderson v. Liberty Lobby*, 477 U.S. 242, 249–50 (1986). Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits

show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

To defeat a motion for summary judgment the nonmoving party "must make a showing sufficient to establish any essential element of [his] cause of action for which [he] will bear the burden of persuasion at trial." *Smith ex rel. Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997); *see also Celotex Corp.*, 477 U.S. at 322–23. "The existence of a mere scintilla of evidence, however, is insufficient to fulfill this requirement. The nonmoving party must show that there is evidence upon which a jury reasonably could find for the plaintiff." *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). The existence of a materially disputed issue of fact will be sufficient to avoid summary judgment only if the disputed fact is determinative of the outcome under the applicable law. *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010).

## IV.  Plaintiff's false arrest claim in Count I fails because there was sufficient probable cause for his arrest.

In  Count I of the Complaint, Plaintiff alleges that he was arrested without probable cause. In Illinois, the report of an eyewitness to a crime is sufficient to provide probable cause for an arrest. *Gramenos v. Jewel Companies, Inc.*, 797 F.2d 432, 439 (7th Cir. 1986). "When an officer has received his information from some person—normally the putative victim or an eye witness—who it seems reasonable to believe is telling the truth, *he has probable cause*." *Id.* (citations omitted) (emphasis added)

In *Gramenos*, plaintiff Gramenos was arrested for shoplifting on the sole eyewitness testimony of defendant Jewel's security guard, Vaughn. *Id*. at 433. Gramenos was prosecuted and acquitted. *Id*. Vaughn was the only witness for the state, and at the end of Vaughn's testimony, the judge issued a verdict of "not guilty." *Id*. Gramenos then filed suit under 42 U.S.C. § 1983 against the supermarket, Vaughn, and others for false arrest amongst other claims. After discovery had been completed, the defendants moved for summary judgment, which was granted. *Id*.

In upholding the decision of the lower court, the Seventh Circuit stated that just as a single eyewitness's statement—without further investigation or a narration of contrary evidence—can support a warrant, so a single eyewitness's statement can support an indictment and a conviction. *Id*. at 440. The Court stated further that if the state had chosen to indict Gramenos, it could have done so on the basis of Vaughn's testimony without offering Gramenos any opportunity to rebut the testimony and without telling the grand jury anything more. *Id*. And if the judge at trial had chosen to believe Vaughn over Gramenos, that would have been sufficient to support a conviction "beyond a reasonable doubt." *Id*. Finally, the court stated that it would be "passing strange" if the evidence sufficient to establish guilt at trial were not enough to make an arrest. *Id*.

In *Smith v. City of Chicago*, the claim arose from a woman's allegations that plaintiff Smith sexually assaulted her. 913 F.2d 469, 470 (7th Cir. 1990). Three days after the

attack, the victim went to a Chicago police station to view photographs of known sex offenders. *Id*. She identified a photograph of plaintiff Smith as that of her attacker. *Id*.

Based on the rape victim's identification, Smith was eventually convicted of the rape. Once released from prison, he brought a claim of false arrest against the defendants. *Id*. at 471. Smith's claims were based on his belief that a positive laboratory report concerning the presence of semen that the police had performed was fabricated because the police had not received a genuine vaginal swab of the rape victim. *Id*. In a pre-trial agreement with defendants, Smith agreed to a judgment of nominal damages without the defendants admitting liability on the false arrest claim. *Id*. at 472. Smith was allowed to appeal the judgment in exchange. *Id*. On appeal, the Seventh Circuit stated that Smith had to demonstrate that the fabricated evidence resulted in an absence of probable cause for his arrest, meaning that he would not have been lawfully arrested in the absence of the fabricated evidence. *Id*. at 473. The Court further stated that:

> …there is not even a constitutional violation when there is a basis for a conclusion that probable cause supports a person's arrest…[r]egardless of the defendant's motives toward the plaintiff, the existence of probable cause for arrest is *an absolute bar* to a Section 1983 claim for unlawful arrest, false imprisonment, or malicious prosecution. *Id*. (emphasis added)

The *Smith* court eventually ruled that because the rape victim's identification of Smith as her attacker and her declarations in the criminal complaint clearly supported a probable cause determination, Smith would have been lawfully arrested for sexual assault *even if* the defendants had been involved in the falsification of the police

laboratory report regarding the presence of sperm. *Id*. at 473-474. (emphasis added) In

upholding the decision of the district court, the Seventh Circuit stated:

> Because probable cause existed for Smith's arrest and he would, thus,
> have been arrested in the absence of the defendants' alleged
> unconstitutional conduct, Smith has failed to suffer actual damages from
> the asserted constitutional deprivation, and his recovery was properly
> limited to nominal damages. *Id*. at 474.

In the case at hand, Defendants Steven W. Garner ("Garner") and Timothy B. Moore

("Moore") presented Clarence Heinz ("Heinz"), the victim of the underlying home

invasion and burglary, with the first photo line-up of potential suspects on October 21,

2011. (Statement of Undisputed Material Facts ("S.O.F.") 20). Heinz did not select any of

the pictures from the first photo line-up, even though he got a very good look at the

suspect. (S.O.F. 21). Heinz's neighbor Ronald Bullock ("Bullock") was also presented

with the same photo line-up on October 21, 2011 and he picked one of the photos.

(S.O.F. 17). Bullock was a witness to the events that went on around Heinz house and he

also saw one of the assailants loitering near Heinz' house. (S.O.F. 12, 13) However,

Bullock was not overwhelmingly confident in his pick from the first photo line-up.

(S.O.F. 18).

On October 27, 2011, Heinz was presented with a second photo line-up which

included Plaintiff Jackson's photo. (S.O.F. 29). Heinz selected Jackson's photo from the

second photo line-up as the individual who broke into his house. (S.O.F. 30). Heinz said

he was confident in his pick of Jackson's photo. (S.O.F. 31, 32). When Bullock was

presented with the same second photo line-up, he also picked Jackson's photo as the

individual he saw around Heinz' house on the date of the incident. (S.O.F. 27). Bullock said that he felt a lot more comfortable with his pick of Jackson's photo in the second photo line-up than he did with his pick in the first photo line-up. (S.O.F. 28). Based on the positive identifications by Heinz and Bullock, Jackson was arrested for the Heinz home invasion and burglary. (S.O.F. 33, 39). Applying the rulings and facts of *Gramenos* and *Smith* to this case, the positive identification by one witness would have been sufficient to establish probable cause for the arrest of Jackson. Here, not only did the victim Heinz identify Jackson as the individual who broke into house, he was also identified by neighbor Bullock as the individual who was around the victim's house on the date of the incident.

Jackson makes allegations in his Complaint against Defendants Garner and Moore stating that they maliciously removed a photo from the first photo line-up and then presented a "black and white" photo lineup, with only Jackson's photo depicted in color. (Complaint, ¶17). Those assertions are false, and Plaintiff has not produced any evidence to support these allegations. Exhibit 5, which shows the actual second photo line-up at issue with all photos in full color, does not support any of Plaintiff's allegations. The relevant facts here are that Jackson was positively identified by not one, but two individuals, including the victim, as the person who broke into Heinz' house on October 19, 2011. As the court stated in *Gramenos*, "it would be passing strange if the evidence (a single eyewitness statement) sufficient to establish guilt at trial were not

14

enough to make an arrest. 797 F.2d at 440. Similar to the rape victim's identification of
the plaintiff in *Smith*, Heinz and Bullock's identification of Jackson was sufficient
probable cause for Jackson's arrest. 913 F.2d at 474. As the Seventh Circuit stated in
*Smith*, the existence of probable cause for arrest is *an absolute bar* to a Section 1983 claim
for unlawful arrest, false imprisonment, or malicious prosecution. *Id*. at 473. (emphasis
added)

Hence, as a result of the existence of probable cause for his arrest, Jackson is barred
from bringing a claim for false arrest against Defendants. Therefore, summary
judgment must be granted in favor of Defendants on Jackson's false arrest claim in
Count I.

## V.   Plaintiff has presented no evidence to support his claim in Count III of intentional infliction of emotional distress.

In Count III, Plaintiff claims that the conduct of the individual Defendants was
extreme and outrageous and that the individual Defendants intended to inflict severe
emotional distress on Jackson or knew that there was a high probability that their
conduct would do so. (Complaint, ¶52). To state a cause of action for intentional
infliction of emotional distress, (1) the conduct involved must be truly extreme and
outrageous; (2) the actor must either intend that his conduct inflict severe emotional
distress, or know that there is at least a high probability that this conduct will cause
severe emotional distress; and (3) the conduct must in fact cause severe emotional
distress. *Harriston v. Chicago Tribune Co.*, 992 F.2d 697, 702 (7th Cir. 1993) (citing *McGrath*

*v. Fahey*, 126 Ill.2d 78, 533 N.E.2d 806, 809 (1988)). Jackson cannot sustain any of the

three elements of this claim. Whether conduct is extreme and outrageous is judged on

an objective standard, based on all the facts and circumstances of the particular case.

*Graham v. Commonwealth Edison Co.*, 318 Ill.App.3d 736, 742 N.E.2d 858, 866 (1st Dist.

2000); see also *Honaker v. Smith*, 256 F.3d 477, 490 (7th Cir. 2001).

To be considered extreme and outrageous, "a defendant's conduct must be so

extreme as to go beyond all possible bounds of decency" and must be "regarded as

intolerable in a civilized community." *Feltmeier v. Feltmeier*, 207 Ill.2d 263, 798 N.E.2d 75,

80-81 (2003) (See also *Lewis v. Sch. Dist. # 70*, 523 F.3d 730, 747 (7th Cir. 2008) ("This

standard is quite high."). Therefore, "to serve as a basis for recovery, the defendant's

conduct must be such that 'the recitation of the facts to an average member of the

community would arouse his resentment against the actor, and lead him to exclaim[:]

'Outrageous!'" *Honaker*, 256 F.3d at 490.

In *Cornish v. Papis*, plaintiff sued defendant police officers for false arrest and

intentional infliction of emotional distress in connection with his detention and

questioning of his spouse and sibling by police defendants over a four-day period. 962

F. Supp. 1103 (C.D. Ill. 1997). At trial, the defendants moved for judgment as a matter of

law. *Id*. As a result of the existence of probable cause for the arrest of plaintiff, the court

first ruled in favor of defendants on the false arrest claim, finding that defendants had

probable cause to arrest plaintiff and that the defendants' conduct did not deprive him

of any right, privilege, or immunity protected by the U.S. Constitution. *Id*. at 1109. The *Cornish* court further ruled that there was no legally sufficient evidentiary basis presented at trial with which a reasonable jury could find that the plaintiff was wrongfully arrested and/or falsely arrested. *Id*.

Regarding his intentional infliction of emotional distress claim, Judge Mills ruled that plaintiffs did not show that they suffered intentional infliction of emotional distress at the hands of the defendants. *Id*. at 1101. The court stated that although the defendants questioned plaintiffs, the defendants did not deprive them of food, drink, or treat them harshly in any manner. *Id*. Even though suspect plaintiff was detained, he was not subjected to extreme and outrageous conduct by the defendants, *the defendants had probable cause to arrest suspect plaintiff*, and the defendants did not detain him any longer than necessary under the circumstances. *Id*. (emphasis added) The court went on to cite the Illinois Supreme Court which stated:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency. *Id*. (quoting *Public Finance Corp. v. Davis*, 66 Ill.2d 85, 89–90, 360 N.E.2d 765, 767 (1976))

Ultimately, Judge Mills ruled that the plaintiffs did not show that the defendants' conduct rose to such a level and that there was no legally sufficient evidentiary basis presented at trial with which a reasonable jury could find that defendants' conduct was

"so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency in a civilized society." *Id*.

In *Warfield v. City of Chicago*, plaintiffs brought a claim for intentional infliction of emotional distress against defendant officers, alleging that they engaged in extreme and outrageous conduct by firing their weapons at plaintiffs. 565 F. Supp. 2d 948, 965 (N.D. Ill. 2008). The court employed an objective standard to determine whether the conduct alleged was extreme and outrageous, taking into consideration, among other things: the degree of power or authority which a defendant has over a plaintiff; whether the defendant reasonably believed that his objective was legitimate; and whether the plaintiff is particularly susceptible to emotional distress because of some physical or mental condition or peculiarity." *Id*.

The *Warfield* court ruled that plaintiffs could not show that the defendant officers' conduct was "truly extreme and outrageous," because the officers were in pursuit of an apparently armed and dangerous criminal who had just threatened their lives. *Id*. "Under these facts, the officers reasonably believed that their objective—pursuing the [criminal]—was legitimate." *Id*. The court also ruled that plaintiffs did not present any evidence that they suffered severe emotional distress. *Id*. The court stated that although fright, horror, grief, shame, humiliation, worry, etc. may fall within the ambit of the term 'emotional distress,' these mental conditions alone are not actionable. *Id*. (quoting *Kleidon v. Rizza Chevrolet, Inc.*, 173 Ill.App.3d 116, 122 Ill.Dec. 876, 527 N.E.2d 374, 377

(1988)). The court ultimately ruled that plaintiffs' complaints of "fright, horror, grief, shame, humiliation, [and] worry," were not sufficient to state a claim for intentional infliction of emotional distress. *Id*.

In *Rebolar ex rel. Rebolar v. City of Chicago, Ill.*, even though the defendant officers pointed a gun at plaintiff, placed him in handcuffs for a period of time up to ten minutes, and mistakenly detained him in an investigation as a suspect for auto burglary, the court found that the defendant officers' actions *were based on probable cause* and did not come close to being "truly extreme and outrageous," even though the officers ultimately were mistaken about plaintiff's role in a burglary. 897 F. Supp. 2d 723, 741 (N.D. Ill. 2012). The court found that the undisputed facts showed as a matter of law that the defendant officers' conduct was neither extreme nor outrageous. *Id*.

As established above, the individual Defendants in this case had sufficient probable cause to arrest Plaintiff Jackson. Based on the probable cause, Jackson was arrested on October 27, 2011. (S.O.F. 39). On November 15, 2011, Jackson was indicted for the Heinz home invasion and burglary. (S.O.F. 47). Ultimately, Jackson's trial was held from September 10-12, 2012 and he was found not guilty. (S.O.F. 48). Like the plaintiffs in *Cornish* and *Rebolar*, Jackson has not presented any evidence of any conduct by individual Defendants that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *Cornish*, 962 F. Supp. at 1101. The only

relevant fact, as established by *Rebolar*, is that the individual Defendants' actions in this case were based on probable cause.

Furthermore, applying the objective standard employed by the *Warfield* court, the individual Defendants in this case had no reason to believe, and Jackson has presented no evidence, that their arrest of Jackson based on proper probable cause was not legitimate. The two witnesses who identified Jackson in the photo line-up also identified Jackson at his trial. (S.O.F. 50, 53). At his deposition, Heinz identified Jackson again as the individual who broke into his home. (S.O.F. 55). The individual Defendants had no reason to believe and Jackson has presented no evidence that he was particularly susceptible to emotional distress because of some physical or mental condition or peculiarity, much less that the Defendants were aware of such a susceptibility.

Finally, Jackson has not presented any evidence that he suffered "severe emotional distress." (Complaint, ¶23). The only allegation he makes of any support towards his claim of intentional infliction of emotional distress is that "he has sustained injuries, humiliation, and indignities (sic), and suffered great mental and emotional pain and suffering." (Complaint, ¶41). In his Answers to Interrogatories, Plaintiff has also complained that he is seeking "damages for discomfort…and torment induced by fear." See Jackson's Answers to Interrogatories attached hereto as Exhibit 12. However, as the *Warfield* court ruled, complaints of "fright, horror, grief, shame, humiliation, [and]

worry," are not sufficient to state a claim for intentional infliction of emotional distress. 565 F. Supp. 2d at 965. Besides one mental health counseling visit while in custody prior to trial, Jackson has not undergone any mental health treatment as a result of the incident. (S.O.F. 56). Jackson has not been prescribed any medication for any alleged mental or emotional health issues as a result of the underlying facts. (S.O.F. 57).

As the Seventh Circuit stated in *Lewis*, the standard [for conduct to be considered extreme and outrageous] is quite high. 523 F.3d 730 at 747. Jackson fails to meet that standard and summary judgment must be granted in favor of Defendants on Jackson's claim in Count III of intentional infliction of emotional distress.

## VI.  Plaintiff has not presented any evidence to support his claim in Count IV that he was denied a right to a fair trial.

In Count VI of the Complaint, Jackson alleges that the individual Defendants, Moore, Garner, and Unknown Officers deprived him of fair criminal proceedings by engaging in multiple acts which include, but are not limited to, using identification evidence derived from a suggestive photo lineup at trial, failing to disclose known exculpatory evidence, ignoring exculpatory evidence, failing to investigate actual innocence of Jackson, submitting false charges as contained in the criminal complaints, submitting false police reports, omitting exculpatory evidence from police reports, swearing to false statements, and otherwise acting to influence and persuade the State's Attorney to prosecute Jackson to deny Jackson fair legal proceedings. (Complaint, ¶56).

Jackson essentially alleges that the Defendants have committed a *Brady* violation because "the suppression of evidence favorable to an accused violates the due process [right to a fair trial] where the evidence is material either to guilt or to punishment, irrespective of good faith or bad faith." *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196-97 (1963). The Seventh Circuit holds that a *Brady* violation occurs when the government fails to disclose evidence materially favorable to the accused." *Bielanski v. Cnty. of Kane*, 550 F.3d 632, 643 (7th Cir. 2008) (citing *Youngblood v. West Virginia*, 547 U.S. 867, 869, 126 S.Ct. 2188 (2006).) In order to make out a *Brady* claim, "a plaintiff must demonstrate that the evidence at issue is favorable to the accused, either because it is exculpatory or impeaching; that the evidence was suppressed by the government, either willfully or inadvertently; and that the evidence was material, that is, that there is a reasonable probability that prejudice ensued." *Id.* (citing *United States v. Warren*, 454 F.3d 752, 759 (7th Cir. 2006). Defendants have unequivocally denied Jackson's allegations. (See Answer, ¶56). Furthermore, Jackson has not presented or provided any evidence which supports his allegations in Count VI or that a *Brady* violation occurred which caused him any prejudice.

Even if Jackson's allegations are taken as true, Jackson has not established how any of the individual Defendants' actions deprived him of his due process the right to a fair trial or caused him any prejudice. In *Schertz v. Waupaca Cnty.*, the court stated that whatever misconduct was committed by the defendant officer, Schertz could not

prevail on any claims involving the allegations of [misconduct] because there was no showing that the alleged misconduct had any prejudicial effect on his defense. 683 F. Supp. 1551, 1573 (E.D. Wis. 1988) aff'd, 875 F.2d 578 (7th Cir. 1989). The court stated that plaintiff *was acquitted* at both trials and the court did not understand him to be claiming that the outcome of these trials was unjust. *Id*. Because the plaintiffs failed to show that the trials were fundamentally and ultimately unfair, summary judgment was granted in defendants' favor. *Id*. (emphasis added)

In the Seventh Circuit case of *Christman v. Hanrahan*, plaintiff's complaint alleged that a storekeeper named Koppel was killed during an attempted robbery on November 6, 1970. 500 F.2d 65, 66 (7th Cir. 1974). The incident was witnessed by the victim's wife and also by a bystander. *Id*. Four months later, the plaintiff was arrested and charged with murder. *Id*. At a police lineup, the victim's wife Mrs. Koppel tentatively identified plaintiff as the killer. *Id*. After leaving the station, however, she telephoned a police sergeant to state that she was not positive that plaintiff was the man who had shot her husband and this information was entered on a supplemental police report. *Id*.

On April 10, 1971, plaintiff's trial on the murder charge commenced. *Id*. After three days of trial, plaintiff's defense attorney first learned of Mrs. Koppel's telephone call expressing doubt about her identification of plaintiff. *Id*. Plaintiff's complaint alleged that, pursuant to a discovery motion, the police report had been produced in advance of trial, but that it had been deliberately altered to omit any reference to Mrs. Koppel's

telephone call. *Id*. When plaintiff's counsel learned of the theretofore concealed telephone call, the matter was brought to the attention of the court and the jury. *Id*. After only 10 minutes of deliberation, the jury returned a verdict of not guilty. *Id*.

Although there was a clear showing of evidence suppression and the court found that the defendants were guilty of serious misconduct, the Court in *Christman* still ruled that plaintiff was not deprived of his constitutional right to a fair trial and there was no *Brady* violation. *Id*. at 67. The court stated that if evidence concerning the telephone call had been suppressed until after the trial, *and if the jury had returned a guilty verdict*, unquestionably plaintiff would have been deprived of liberty without due process. *Id*. (emphasis added)

In *Bielanski*, the plaintiff, after being acquitted of child sexual abuse charges, brought claims against the county, county child advocacy agency, agency's advisory board, and county police officer and state employee for violation of her due process right to a fair trial under the *Brady* standard. 550 F.3d at 635. In its analysis, the *Bielanski* court cited several cases from other circuits that considered the question of whether a *Brady* claim that there was a violation of a due process right to a fair trial is extinguished *when a defendant is acquitted* or charges are dropped. *Id*. at 644. (emphasis added) *See Morgan v. Gertz,* 166 F.3d 1307, 1310 (10th Cir. 1999) ("Regardless of any misconduct by government agents before or during trial, a defendant who is acquitted cannot be said to have been deprived of the right to a fair trial."); *Flores v. Satz,* 137 F.3d 1275, 1278 (11th

Cir. 1998) (finding no *Brady* violation in the face of an acquittal because *Brady* protects a defendant from an unfair trial and an acquitted defendant does not suffer the effects of an unfair trial); *McCune v. City of Grand Rapids,* 842 F.2d 903, 907 (6th Cir. 1988) (where criminal charges are dropped before trial, and thus the underlying criminal proceeding terminated in an appellant's favor, there is no injury caused by the act of suppressing exculpatory evidence). *Id.* at 645.

The Seventh Circuit in *Bielanski* ultimately ruled that because plaintiff Bielanski also had a trial that resulted in her acquittal, she did not suffer the harm that *Brady* aimed to prevent and therefore, there was no *Brady* violation. *Id.* (citing *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375 (1985) (the purpose of the *Brady* rule is "to ensure that a miscarriage of justice does not occur.")

In the case here, Jackson was found not guilty after his trial for home invasion and burglary. (S.O.F. 48). Hence, even if Jackson had evidence to support his allegations in Count IV, the verdict of not guilty stands against Jackson's proposition that his trial was somehow unjust or unfair to prove a *Brady* violation. Jackson was afforded his fundamental right to a trial from September 10, 2012 – September 12, 2012 where he was allowed to present evidence and a verdict of not guilty was entered.

Furthermore, there is no evidence that the Defendants withheld any evidence from Jackson, as he as alleged. There was also no duty on the part of the Defendants to continue their investigation after sufficient probable cause was established for his

arrest, indictment, and if it would have been the disposition, a guilty verdict. See *Gramenos,* 797 F.2d 432 at 440. The Defendants were not required to investigate Jackson's innocence. See *Id.* ("a single eyewitness's statement—*without further investigation* or a narration of contrary evidence—can support a warrant, so a single eyewitness's statement can support an indictment and a conviction.") (emphasis added) See also *Garner v. Salluom* 52 F. App'x 299, 301 (7th Cir. 2002) ("Once an officer believes that probable cause exists, he is under no constitutional duty to further investigate the matter to determine if the individual's claim of innocence is correct.")

Hence, Jackson has not presented any evidence to establish his allegations in Count IV that he was deprived of his due process right to a fair trial. For arguments sake, even if the allegations in Count IV were true, Jackson was found not guilty at his underlying trial. He cannot now claim that his trial was unfair or unjust to establish that there was a *Brady* violation. Therefore, summary judgment must be granted in favor of Defendants on Jackson's claims in Count VI that he was denied his due process right to a fair trial.

## VII.    Plaintiff has no basis for his malicious prosecution claims in Count V.

In Count V of the Complaint, Plaintiff alleges that the individual Defendants maliciously caused criminal charges to be filed and prosecuted against him and that there was no probable case for the institution of criminal charges against him. (Complaint, ¶61). To establish malicious prosecution under Illinois law, a plaintiff must show: (1) the commencement or continuance of an original criminal or civil judicial

proceeding by the defendant; (2) that the proceeding terminated in favor of the plaintiff; (3) the absence of probable cause; (4) malice; and (5) damages. *Swick v. Liautaud*, 169 Ill. 2d 504, 512 (1996). The failure to establish any one of the five elements precludes recovery for malicious prosecution. *Fabiano v. City of Palos Hills*, 336 Ill. App. 3d 635, 641 (2002). In a malicious-prosecution case, probable cause is defined as "a state of facts that would lead a person of ordinary care and prudence to believe or to entertain an honest and sound suspicion that the accused committed the offense charged." *Fabiano v. City of Palos Hills*, 336 Ill. App. 3d 635, 642 (2002). "It is the state of mind of the person commencing the prosecution that is at issue, not the actual facts of the case or the guilt or innocence of the accused." *Sang Ken Kim v. City of Chicago*, 368 Ill. App. 3d 648, 654 (2006). Errors on the part of the officers that don't rise to the level of "grossly negligent" do not affect the probable cause inquiry when the officer has an honest belief that the accused is probably guilty of the offense. *Id*. at 654-55.

As already established, the individual Defendants in this case had probable cause to arrest Jackson. Furthermore, the same probable cause to arrest Jackson was sufficient to indict him and find him guilty. See *Gramenos*, 797 F.2d at 440. The same probable cause which Defendants possessed invalidates any claim by Jackson that the individual Defendants acted with malice. Jackson has also not produced any evidence that Defendants acted with malice. It is sufficient if there is probable cause regardless of whether the accused is in fact guilty or not. See *Frank Parmelee Co. v. Griffin*, 136 Ill. App.

307, 314 (1st Dist. 1907) aff'd, 232 Ill. 503, 83 N.E. 1041 (1908) ("It is not enough…to

entitle one to recover damages in a suit for alleged malicious prosecution that he has

been arrested and imprisoned, charged with a crime and subsequently discharged for

want of prosecution or acquitted upon a trial.")

Furthermore, the Seventh Circuit in *Washington v. Summerville* took issue with

malicious prosecution claim against detectives (like the Defendants in this case) and

stated that such claims were "misplaced." 127 F.3d 552, 559 (7th Cir. 1997). The Court

went on to state regarding malicious prosecution claims against detectives:

> In her concurrence in *Albright v. Oliver,* Justice Ginsburg explained that a
> malicious prosecution claim against police officers *is an anomaly*. 510 U.S.
> 266, 279 n. 5, 114 S.Ct. 807, 816 n. 5, (1994) (Ginsburg, J., concurring).
> (emphasis added) She reasoned that the principal player in carrying out a
> prosecution is not the police officer, but the prosecutor. *Id.* The detectives'
> role in this case was in effectuating and maintaining a seizure, not in
> initiating and pursuing a criminal prosecution. *Washington*, 127 F.3d at
> 559-60.

Hence, Jackson cannot prove any of elements of a malicious prosecution claim against

Defendants and it is improper to even allow Jackson to bring a malicious prosecution

claim against the individual Defendant detectives.

Therefore, Jackson's failure to establish any of the elements of his malicious

prosecution claim and furthermore, improperly bringing such a claim against the

individual Defendant detectives defeats his claims in Count V. Summary judgment

must therefore be entered in favor of the Defendants for Jackson's malicious

prosecution claims in Count V.

## VIII.   Count VI should be dismissed if all other claims fail.

Count VI attempts to assert an indemnity claim against Defendant City of Peoria under 745 ILCS 10/9-102 alleging that the City at all times material to the Complaint, was the employer of the police Defendants. (Complaint, ¶68). While that may be true, the claim under Count VI must be dismissed if all of the other claims are also dismissed. Hence, if all other Counts of the Complaint are dismissed, Count VI should also be dismissed, as there is no liability for which the City of Peoria would be required to indemnify an employee. See *Teesdale v. City of Chicago* 792 F.Supp.2d 978, 991 (N.D.Ill., 2011).

## IX.   Plaintiff does not have any basis for his claim in Count VII that he was the subject of an unreasonable search and seizure.

In Count VII of the Complaint, Plaintiff alleges that the individual Defendants forced open Jackson's front door and entered Jackson's abode without a warrant, without probable cause, and absent exigent circumstances. (Complaint, ¶71). Defendants stipulate that the Fourth Amendment of the United States Constitution provides that:

the right of the people to be secure in their persons, houses, papers, and
effects, against unreasonable searches and seizures, shall not be violated,
and no warrants shall issue, but upon probable cause, supported by oath
or affirmation, and particularly describing the place to be searched, and
the persons or things to be seized.

On October 29, 2011, after Jackson was arrested, Defendant Garner applied for a

search warrant to search Jackson's home. (S.O.F. 40). As this was a case involving a

home invasion and burglary, the purpose of the search warrant was to see if Heinz'

property or any other evidence Garner could obtain from Jackson's home might still be

there. (S.O.F. 41). A complaint (for a search warrant) supports a finding of probable

cause when it "sets forth sufficient evidence to induce a reasonably prudent person to

believe that a search will uncover evidence of a crime." *United States v. Peck*, 317 F.3d

754, 756 (7th Cir. 2003). "[P]robable cause requires only a probability or chance of

criminal activity, not an actual showing of such activity." *Illinois v. Gates*, 462 U.S. 213,

243 n. 13, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

In *Russell v. Harms*, the underlying complaint in support of the (search) warrant

relied on information from Bayley, a known, credible witness whose allegations had

been corroborated by the police. 397 F.3d 458, 463 (7th Cir. 2005). Bayley advised that

plaintiff's position as store manager gave her the opportunity to steal inventory from

Circus Video without being detected and that she and her roommate were selling

hundreds of videotapes and Nintendo games online. *Id*. The police independently

confirmed that Russell's roommate, Davis, was selling large quantities of videotapes

online, and that some of these tapes appeared to have been obtained from Circus Video. *Id*. The police had been advised by a reliable witness that Russell had not purchased or legally obtained Circus Video merchandise. *Id*. They also knew that Davis needed access to a computer to participate in the online auctions. *Id*. In ruling on the probable cause basis for the search warrant, the Court stated "given the high volume and frequency of these sales, the officers were reasonable to believe that they would find this computer in the suspects' house." *Id*. "In short, the complaint laid out evidence that would lead a prudent person to believe *that a search of plaintiffs' home would uncover evidence of theft*." *Id*. (emphasis added) "The fact that the officers may have turned out to be wrong does not undermine this conclusion." *Id*. *See Beauchamp v. City of Noblesville, Ind.*, 320 F.3d 733, 743 (7th Cir. 2003) (probable cause determination is based upon only those facts known to the police when they apply for the warrant). *Id*. at 464.

When Defendant Garner applied for the search warrant, Plaintiff Jackson was already under arrest for the home invasion and burglary of Heinz' home based on sufficient probable cause. (S.O.F. 39) Just like the theft case in *Russell v. Harms*, it would naturally follow that a prudent person would suspect that a search of Jackson's home was likely to uncover evidence of theft. Hence, sufficient probable cause existed for the issuance of the search warrant of Jackson's home. Furthermore, Heinz stated that the man who broke into his house was wearing a shirt with an emblem on it. (S.O.F. 9). Two shirts with similar emblems on them were found in Jackson's home. (S.O.F. 42).

Next, Jackson contends that the individual Defendants entered Jackson's abode without a warrant (Complaint, ¶71). Jackson does not have any evidence to support this claim. The parties deposed Holly Adornato ("Adornato"), Jackson's neighbor at the time of the underlying incident and the person who Jackson identified as someone who would support his claim of a search without a warrant. Adornato lived in the house to the immediate left of Jackson's home at the time of the underlying incident. (S.O.F. 42). Adornato testified that before she saw the three police officers outside of Jackson's house to execute the search warrant, she did not see any other officers go into Jackson's home. (S.O.F. 46). Furthermore, as established by the search warrant and search warrant inventory of Jackson's house, the search warrant was issued on October 29, 2011 at 12:37 PM and was executed at 1:20 PM. (S.O.F. 40). Jackson cannot controvert this evidence. The only independent witness that Jackson claims could provide a basis for his unlawful search claim − Adornato − does not in fact support his claim.

Sufficient probable cause existed for the issuance of the search warrant of Jackson's home and there is no evidence that supports Jackson's claim that there was a warrantless search of his home. Thus, Jackson's claim in Count VII that he was the victim of an unreasonable search and seizure is without basis or merit and Defendants must be granted summary judgment in their favor for this claim as well.

**X.    Plaintiff's failure to intervene claims against Unknown Officers in Count II must be dismissed.**

In Count II of Plaintiff's Complaint, he makes claims against "Unknown Officers" for failure to intervene. (Complaint, ¶¶ 48-49). Jackson cannot pursue his claims against "Unknown Officers" because claims against unknown persons are "meaningless and uncompensable." See *Copeland v. Northwestern Memorial Hosp.*, 964 F.Supp. 1225, 1234 (N.D.Ill., 1997). Furthermore, after extensive discovery, Jackson has not even attempted to name the "Unknown Officers." *See Hessel v. O'Hearn*, 977 F.2d 299, 305 (7th Cir. 1992). Hence, Jackson's claims in Count II for failure to intervene must be dismissed.

## XI. CONCLUSION

WHEREFORE, the Defendants, TIMOTHY B. MOORE, STEVEN W. GARNER, and CITY OF PEORIA, respectfully pray that the Court enter an Order granting their Motion for Summary Judgment and entering judgment in favor of the Defendants and against the Plaintiff, that they have their fees and costs, that the Court enter an order dismissing Count II of the Complaint against Unknown Officers, and for such other and further relief as the Court deems just.

TIMOTHY B. MOORE, STEVEN W. GARNER, and
CITY OF PEORIA, Defendants

By: _____ *s/Peter R. Jennetten* _____
                    Peter R. Jennetten
QUINN, JOHNSTON, HENDERSON, PRETORIUS & CERULO

Peter R. Jennetten (Illinois Bar No. 6237377)
QUINN, JOHNSTON, HENDERSON, PRETORIUS & CERULO
227 N.E. Jefferson Ave.
Peoria, IL  61602-1211
Telephone:  (309) 674-1133
Facsimile:  (309) 674-6503
Email: pjennetten@qjhpc.com
I:\1\Civil\Jackson v. Moore and Garner (City of Peoria) 101 066 234\jackson msj.docx

**CERTIFICATE OF SERVICE**

I hereby certify that on **July 31, 2014**, I electronically filed this **MOTION FOR SUMMARY JUDGMENT** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

Scott T. Kamin                                              **Attorney for Plaintiff**
Law Offices of Scott T. Kamin
55 E. Jackson Blvd.
Suite 1050
Chicago, IL  60604
Telephone:  (312) 322-0077
Facsimile:  (312) 322-1041
Email:  scotttkamin@aol.com


Phillip A. Brigham                                         **Attorney for Plaintiff**
Law Office of Phillip Brigham, LLC
55 E. Jackson Blvd.
Suite 1050
Chicago, IL  60604
Telephone:  (312) 986-0654
Facsimile:  (312) 322-1041
Email:  pbrigham@phillipbrighamlaw.com


Sonni C. Williams                                          **Co-Counsel for Moore, Garner, and**
Interim Corporation Counsel                                 **City of Peoria**
City of Peoria Legal Department
419 Fulton St.
Room 200
Peoria, IL  61602
Telephone:  (309) 494-8590
Facsimile:  (309) 494-8558
Email:  swilliams@peoriagov.org


*s/Peter R. Jennetten*
Peter R. Jennetten (Illinois Bar No. 6237377)
QUINN, JOHNSTON, HENDERSON, PRETORIUS & CERULO
227 N.E. Jefferson Ave.
Peoria, IL  61602-1211
Telephone:  (309) 674-1133
Facsimile:  (309) 674-6503
Email: pjennetten@qjhpc.com